RICHARD W. BAGOT, RELATOR v. BOARD OF SUPERVISORS OF
ANTRIM COUNTY.

*Removal of County Seat.*

Under the Constitution and laws of Michigan, the proposition for the
removal of a county seat may originate with the board of super-
visors. No previous action of the legislature is necessary to
give the board authority to act. It is immaterial that in the
particular case the county seat was permanently located by the
legislature when the county was organized. The permanent
location is only until a removal takes place in accordance with
law.

CERTIORARI to the Board of Supervisors. Submitted
April 30. Decided June 9.

*Fitch R. Williams, Gibson & Parkinson* and *Ashley Pond*
for plaintiff in certiorari. County seats have been es-
tablished directly by the Legislature in the following
acts: Grand Traverse 141 of 1851; Oceana, 114 (1851);
Cheboygan, 20 (1853); Alpena, 65 (1857); Iosco, 130 (1857),
221 (1859); Mecosta, 99 (1859); Muskegon 55 (1859);
Mason, 79 (1861); Keweenaw, 118 (1861); Houghton,
128 (1861); Antrim, 78 (1863); Menominee, 163, (1863);
Washington, 252 (1867); Osceola, 301 (1869); Wexford,
386 (1869); Clare, 345 (1871); Baraga, 14 (1875); Ogemaw,
132 (1875); by commissioners named in the act or to be
appointed by the Governor in these: Mecosta, 42 (1857);
Isabella, 157 (1855); Huron, 6 (1859); Delta, 129 (1861);
Kalkaska, 294 (1871); Gladwin, 69 (1875); the Legisla-
ture established temporary county seats to remain until
removed by the supervisors according to law in the fol-
lowing instances: Alcona, 266 (1869); Presque Isle, 398
(1871); they provided for temporary county seats and
withheld jurisdiction over the question of removal for a
certain period from the local authorities in the following
acts: Gratiot, 16 (1855); Bay, 171 (1857); Missaukee,
336 (1871); Isle Royale, 18 (1875); Otsego, 32 (1875);

43 MICH.—73.

Roscommon, 41 (1875), 137 (1877), 17 (1879); the Board of Supervisors was directed to establish the county seat in the following acts: Emmet, 18 (1853); Midland, 36 (1855); Manitou, 92 (1855); Oceana, Mason, and Manistee, 171 (1855); Charlevoix, 390 (1869); School-craft, 373 (1871); and the electors in the following cases: Leelanaw, 48 (1863); Benzie, 385 (1869); Lake, 357 (1871).

*Roswell Leavitt* and *C. I. Walker* for defendants in certiorari. The power of the board of supervisors to remove county seats is recognized in *Harrington v. Wands* 23 Mich. 385; *Att'y General v. St. Clair Supervisors* 11 Mich. 63; *Att'y General v. Lake Supervisors* 33 Mich. 292; they have power to organize new towns from the towns within the county, Const. art. x. § 11; Comp. L. § 480; *Scrafford v. Gladwin Supervisors* 41 Mich. 647; *Att'y General v. Page* 38 Mich. 286.

COOLEY, J. The purpose of this application is to determine the validity of the proceedings instituted and carried through by the supervisors of Antrim county for the removal of the county seat from Elk Rapids where it was located by the Legislature when the county was organized, to a place recently platted as a village and named Belleair. The return brings before us an immense record, presenting the action of the board of supervisors in organizing townships for several years back, in making provision for county buildings, in issuing evidences of debt, and finally in removing the county seat. It is charged that in much of the action of the board there has been a fraudulent purpose; that townships have been prematurely organized in order to have the votes of their supervisors in aid of the removal of the county seat; that there was corruption among the supervisors in the first movements to select the new site; that extraordinary and unlawful powers have been conferred upon committees, and that the proceedings generally have been conducted in disregard of the public interest

and from motives improper in their nature. It was conceded on the argument that the most of these things could have no bearing on the legal controversy here. The premature and improper organization of townships might render the supervisors participating in it censurable, but it is not pretended that the validity of their action could depend upon the motives which brought it about. Neither are the proceedings in the final location of the county seat affected by the fact that there was corruption in the first movements; there being no claim that there is evidence showing corruption in any act of the board of supervisors constituting an essential part of the proceedings. Nor have we in our examination of the record found any question presented by it which appears to us to require discussion, except the question of the power of the board to act at all. The relator denies their power; and it is upon this that he mainly relies.

The power of the board depends upon the proper construction of constitutional and statutory provisions. The Constitution provides that "No county seat once established shall be removed until the place to which it is proposed to be removed shall be designated by two-thirds of the board of supervisors of the county, and a majority of the electors voting thereon shall have voted in favor of the proposed location, in such manner as shall be prescribed by law." Article 10, § 8. It is justly said that this provision is a limitation upon the power of the Legislature. But for this the Legislature might remove a county seat at discretion. The location is a matter of general public concern, and neither the county authorities nor the voters would be entitled of right to a voice in it, if the right were not conferred by the Constitution. And we agree with counsel for the relator that this provision must leave in the Legislature all power over the general subject which can be exercised consistently with it.

The first Legislature which convened after the adop-

tion of the Constitution undertook to define and regulate the powers and duties of the supervisors on various subjects, and among others, on this of the removal of county seats. Section seventeen of the general act for the purpose provides that "Whenever a county seat is proposed to be. removed, the board of supervisors for such county shall have power, by a vote of two-thirds of all the members elect, to designate a place to which such proposed removal is to be made, and after a majority of the electors of such county voting thereon shall have voted in favor of the proposed location, as hereinafter provided, to make and establish such county seat." The next section provides for submitting the proposition of removal to the voters of the county, and the nineteenth section regulates the election and the canvass of the votes, and declares that "in case the result shall be in favor of the proposed removal, [the board] shall provide for such removal, together with all the records and papers of such county, within one year after such result shall be ascertained and determined as aforesaid by them, and shall remove the same as soon as suitable buildings shall have been provided for the reception thereof, and they shall enter upon their records the time when such removal shall be deemed to have taken place, and from and after that time the place so designated shall be and continue the county seat of said county for all purposes whatsoever." Comp. L. §§ 483, 484, 485.

Now it is said on behalf of the relator that while the Constitution prohibits the removal of·a county seat without the approval of the county, it neither confers upon the county the right to remove, nor impairs the power of the Legislature to prevent a removal, nor imposes obligation on the Legislature to sanction or approve or provide for removal to any designated place, nor take from the Legislature the power to say how the removal shall be made, or when, nor in any way impair the power of the Legislature to establish the county seat in the first instance, for a definite or an indefinite time. On

the contrary the supervisory jurisdiction of the Legislature over the question of removal is not less than it was prior to the adoption of the Constitution, and its discretion as to the wisdom or policy of removal in any given case was not impaired thereby. It can still withhold its approval in any case, or delay the accomplishment of such removal, for a definite or indefinite period, as in the exercise of its wisdom and discretion it deems best for the general interest of the State at large, or the special interest of the locality to be affected thereby.

It is also denied that the Legislature by the general law has divested itself of its original jurisdiction over this subject. Reference is made in the brief to the general course of legislation, and it is shown that since the Constitution was adopted the Legislature has in eighteen cases established county seats by direct act; that in six cases it has provided for their establishment by commissioners; that in two cases it has assumed to establish county seats for the time being, and until removed by the board of supervisors pursuant to law; that in ten cases the supervisors or the electors of the county have been directed to establish county seats; while in the case of six counties the Legislature has not only located the county seat, or provided for its location by some other authority than that of the supervisors, but has expressly withheld jurisdiction over the question of removal from the local authorities for a definite period. If the Legislature can withhold this jurisdiction for a definite period, it is said it can do so permanently, and it is argued that this has been done in every case where, as in the case of Antrim county, the Legislature has established the permanent county seat, without the intervention of the supervisors or electors, and has not afterwards submitted any proposition of removal, or expressly authorized any other body to originate one.

If this view is correct, there are many counties in the State whose supervisors may in their discretion originate proceedings for the removal of county seats, and

there are many others in which the steps for a removal must begin with a proposal submitted to the supervisors by the Legislature. The difference in local authority will be due in most cases to a difference in the legislation under which the respective counties have been organized. If we were at liberty to assume that the differences to which attention has been called were always deliberate, and were intended to indicate differences in policy, we might give more weight to the argument than we do now. But we know that temporary circumstances have much to do in shaping the provisions of acts organizing counties, and we should be misled in construction if we left this fact out of view. Because in Antrim county, which had one and only one active business place, the Legislature named that place as the county seat, while in Leelanaw which was not thus favored, the choice was left to the electors, we could hardly with much safety draw the conclusion that a different policy in respect to the two was intended for permanence. It would be wiser to assume that the Legislature acted directly in the one case because it could do so without risk of error, while in the other it needed the judgment of the people as a guide, and therefore proceeded to take it.

We have not found it necessary to express an opinion whether the constitutional provision so far delegates the complete authority over the subject of removal to the supervisors as to preclude the Legislature from retaining in its own hands the power to originate the proposition. Unquestionably if the Legislature may propose the removal, it may also delegate the authority to propose it; and it cannot be doubted that, ever since 1851, the people have supposed the supervisors had that authority; though perhaps they never stopped to consider whether it came from the Constitution or from the statute prescribing the powers and duties of supervisors. Cases have arisen in which the removal of county seats has been vigorously contested without raising this question, though it was in

the case and the objection if sound would have been fatal. But the question after twenty-nine years under the Constitution, is raised in this case for the first time. And what we are called upon to decide is whether up to this time, the people have been mistaken in supposing that the authority of each county over the removal of its county seat was the same with that of all others.

But we think the common view on this subject has been the legislative view also. It is true the statute does not in terms say the supervisors shall or may propose the removal, but the designation of the place to which removal is proposed is to be made by the supervisors, and this designation of itself includes a proposal of removal. If it was intended that the designation should be preceded by a formal proposal submitted by the Legislature, it is reasonable to suppose the law would have so declared. Instead of doing so it proceeds to say that when the designated site has been approved by the people, the supervisors shall perform the necessary acts to perfect the removal, and the removal shall thereby be effected. Not a word appears in the statute anywhere which indicates that legislative intervention was supposed to be necessary at any stage.

Nor is it likely that the Legislature ever supposed that the retention in its own hands of a restraining authority upon the action of the county would be either useful or convenient. The Constitution itself imposed important restraints, and it must be rare indeed that any great wrong could be done by a removal which had the assent of two-thirds of the supervisors and of a majority of all the electors. The wrong, if there was one, would generally consist in the refusal of a minority of the board, being over one-third of all, to submit the question to the people. A further check would seem likely to be more mischievous than useful, and we ought to find somewhere clear evidence of its existence. We do not find such evidence either in legislative expression, or in the common understanding of the people, or in

practical construction, and must assume that none was intended.

The writ of certiorari will be quashed, with costs.

The other Justices concurred.